1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                    )
4    UNITED STATES OF AMERICA,      ) CR19-00143-JLR
                                    )
5                    Plaintiff,     ) SEATTLE, WASHINGTON
                                    )
6    v.                             ) August 27, 2019 -
                                    ) 2:00 p.m.
7    VOLODYMYR KVASHUK,             )
                                    ) MOTION TO REVOKE
8                    Defendant.     ) DETENTION ORDER
                                    )
9    _____

10          VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES L. ROBART
11          UNITED STATES DISTRICT JUDGE

12   _____

13   APPEARANCES:

14   For the Plaintiff:     Michael Dion
                            U.S. Attorney's Office
15                          700 Stewart Street
                            Suite 5220
16                          Seattle, WA  98101

17

18   For the Defendant:     Joshua S. Lowther
                            Lowther Walker
19                          101 Marietta Street NW
                            Suite 3325
20                          Atlanta, GA  30303

21

22

23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

1                        EXAMINATION INDEX

2

3    EXAMINATION OF                                      PAGE

4    ALLA LYNN          DIRECT EXAMINATION              14
                        BY MR. LOWTHER
5                       CROSS-EXAMINATION               22
                        BY MR. DION
6                       EXAMINATION                     28
                        BY THE COURT
7                       REDIRECT EXAMINATION            29
                        BY MR. LOWTHER
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Please be seated.

 2      The clerk will call this matter.

 3          THE CLERK:  Case No. CR19-143, United States versus

 4  Volodymyr Kvashuk.

 5      Counsel, please rise and make your appearances for the

 6  record.

 7          MR. DION:  Good afternoon, Your Honor.  Michael Dion for

 8  the United States, and with me is Special Agent Eric Hergert of

 9  the Internal Revenue Service.

10          THE COURT:  Thank you.

11          MR. LOWTHER:  Good afternoon, Your Honor.  Joshua

12  Lowther for Mr. Kvashuk.

13          THE COURT:  Thank you.

14      Counsel, we are here in connection with a motion to revoke a

15  detention order that was entered in this matter.  I'm going to

16  briefly describe to you what I understand the state of the law to

17  be on that issue so that you can tell me in your remarks if you

18  think I have got it wrong anywhere.

19      This is basically governed by 18 U.S.C. 3142(f).  That's

20  codification or part of the Bail Reform Act of 1984.  The Court

21  is instructed and mandated that it shall hold detention hearings

22  in two instances.  The first is when the case involves one of the

23  enumerated serious offenses outlined in 3142(f)(1) --

24  parenthetically, I would note I do not believe that any of those

25  are implicated here -- and the second instance is when the case

1    involves a serious risk of flight or obstruction of justice.

2        If one of those is met, then the Court is ordered to

3    determine whether any condition or combination of conditions will

4    reasonably assure the appearance of the person as required and

5    the safety of any other person and the community.

6        If I make it through all of those standards, then it

7    discusses the four factors that I'm to review in making that

8    second determination, which have to do with the nature and

9    seriousness of the charges, the weight of the evidence, the

10   defendant's history and characteristics, and the nature and

11   seriousness of the danger posed to any person or the community by

12   the defendant's release.

13       Finally, on a motion such as this, the government will

14   continue to carry the burden, and I am to consider the magistrate

15   judge's ruling, but I consider all of those questions on a de

16   novo basis.

17       So that's what I understand my role is today.  I can tell you

18   that I have had ample opportunity to review this material.  I

19   find that the motion to revoke detention has been filed in the

20   docket at 39.

21       And we will hear from the government first, please.

22           MR. DION:  Thank you, Your Honor.

23       Magistrate Judge Theiler found that the defendant, Volodymyr

24   Kvashuk, was a danger to the community and a risk of flight.  We

25   believe that applying the de novo review standard, the Court

 1    should uphold those findings and uphold her order of detention.

 2         I'm going to focus on the risk of flight, and there's a few

 3    things that I'm going to summarize and then a couple of areas

 4    that I will cover in more depth.

 5         First, I want to talk about the incentive that the defendant

 6    has to flee.  Because, obviously, the more incentive the

 7    defendant has to flee, the greater the risk of flight.

 8         Mr. Kvashuk has tremendous incentive to flee.  The evidence

 9    in this case is very strong.  We summarized it in our brief.  We

10    submitted the complaint.  So I'm not going to go over all of

11    that, but there's a couple of critical things that I want to

12    highlight.

13         One was the discovery of the thumb drive with the

14    five-by-five codes, the critical codes that anybody who actually

15    wanted to unlock this digital currency would need to have.

16    Finding that thumb drive with those codes in this case is the

17    equivalent in a bank robbery case of finding bags of stolen cash

18    in the defendant's bedroom.  It is an extremely powerful piece of

19    evidence.

20         Another important piece of evidence came from the recent

21    analysis -- and it's still going on -- of the defendant's

22    computers and electronic devices.  We submitted one additional

23    exhibit in this case, which was Exhibit 7.  I'm going to put

24    Exhibit 7 up on the overhead, and I'm going to take a minute to

25    explain what Exhibit 7 is.

1     This is a chart that was created by the agents.  I want to

2  be clear, this was not something that came directly from

3  Mr. Kvashuk's computers.  This is a chart created by the agents

4  summarizing evidence from the case, including evidence from the

5  computers.

6     The lines at the bottom of the graph, the vertical lines,

7  show the numbers of transactions where digital currency, CSV, is

8  being illegally purchased.  And as you can see, it starts in

9  November of 2017, and then we get a break on about January 14th

10 of 2018.

11        THE COURT:  Counsel, would you push it up on your screen

12 a bit more?  You are cutting off the chart.

13        MR. DION:  Sure.

14        THE COURT:  Thanks.

15        MR. DION:  And it's a relatively modest number that's

16 purchased during that time.  And the reason is that until

17 January 16th of 2018, this was a manual process.  Every time

18 Mr. Kvashuk wanted to purchase digital currency using a test

19 account, he had to log into that test account, he had to make a

20 purchase, he had to get a confirmation e-mail, and then,

21 ultimately, he had to record those critical five-by-five codes so

22 they could be passed on to whoever the digital currency was going

23 to be sold to.

24     But what the agents found is that on January 16th of 2018, he

25 created -- he wrote a software program to automate this process.

1    He called that program "Purchaseflow.cs."  The agents found that

2    program on his computer.  They were actually able to run it and

3    see what it did.  And what it did was automate the process of

4    embezzlement.  Rather than Mr. Kvashuk having to log in and send

5    e-mails and make purchases and receive e-mails, the program did

6    it all for him.  And what you see after that is an explosion in

7    the number of transactions where digital currency is purchased.

8    The great majority of the theft happened after the creation of

9    this Purchaseflow.cs software program.

10        Now, originally, that program was apparently set to make

11   purchases from two test accounts, avestu and sfwe2eauto.  These

12   were two other testers' accounts.  But then on March 15th of

13   2018, Microsoft, which was beginning to figure out that something

14   was going on here, blocked those accounts.  So Mr. Kvashuk could

15   no longer steal CSV through those accounts, and what he did then

16   was he modified the program so that it would steal CSV using a

17   third test account, the zabeerj2 account.  That was on March 21st

18   of 2018, and you see a couple of big spikes here of additional

19   purchases, then Microsoft blocks that account too, and that's the

20   end of the fraud.

21        But, effectively, this Purchaseflow.cs program shows the

22   history and operation of this scheme.  This is a program created

23   for one purpose, and one purpose only, to automate embezzlement

24   and allow fraud and theft on a massive scale.  And that is how

25   $10 million was stolen.

1    So that's some of the evidence that Mr. Kvashuk is facing.

2    He's facing potentially a very long sentence.  Our current

3    preliminary guidelines calculation is 87 to 108 months after

4    trial.  Not only does Mr. Kvashuk have tremendous incentive to

5    flee, he has a place to flee where United States law enforcement

6    cannot touch him, the Ukraine, where he is constitutionally

7    guaranteed that he cannot be extradited to face charges in this

8    country.

9    The focus of the defense's motion to this Court is the

10   argument that there is no risk that Mr. Kvashuk will flee to the

11   Ukraine because he has filed an asylum claim.  Now, obviously,

12   there's no way for us to determine in this hearing, in this

13   forum, if that claim is legitimate.  Even if we assume that it is

14   legitimate, the reality is that Mr. Kvashuk has no guarantee at

15   all that that claim will be successful.  He faces the reality

16   that if he is released and he chooses to stay in this country,

17   his asylum claim may still well be ultimately denied and he may

18   end up having to serve a long prison sentence and then still be

19   sent back to the Ukraine.  So he might very rationally decide

20   that, given that risk, he's not going to stay around and face a

21   long sentence.

22        THE COURT:  What is the impact on the request for asylum

23   of a conviction for a felony?

24        MR. DION:  I'll say first --

25        THE COURT:  You're not an immigration lawyer.  We could

1    have Mr. Reno come down and do that.  But I'm curious to know.

2            MR. DION:  It is certainly very damaging.  It's a

3    complicated analysis.  And I have had this come up in several

4    cases.  It can depend on loss amounts and a variety of factors.

5    But it is potentially disqualifying.

6            THE COURT:  All right.

7            MR. DION:  Of course, the Ukraine is not the only option

8    for Mr. Kvashuk.  Many people flee to other countries.  Many

9    people become fugitives within the United States itself.

10       The risk of flight in this case is aggravated by the

11   possibility that Mr. Kvashuk has additional assets, possibly

12   millions of dollars, that investigators do not know about at this

13   point.  The defense calls this speculation.  It's certainly true

14   that we cannot prove beyond any doubt that Mr. Kvashuk has

15   additional assets.  But that's always the case when you're

16   talking about the risk of unknown assets.  If we were certain

17   that he had more assets, they wouldn't be unknown and we could

18   move to secure them.  But even though we don't know for certain,

19   there is much more in this case than speculation.  There is

20   strong evidence and there is good reason to believe that

21   Mr. Kvashuk has more assets out there somewhere.

22       And I just want to take a look at some of the evidence.  The

23   first thing we have to start with is the limitation that this

24   Court has on the information before it.  Mr. Kvashuk in this case

25   has chosen to make no meaningful financial disclosure to Pretrial

1    Services.  That is absolutely his right.  He is absolutely within

2    his right not to say how he paid cash for the $1.6 million house,

3    he is absolutely within his right not to say whether he has

4    additional investments in cryptocurrency.  But the consequence of

5    those decisions is that the Court is deprived of critical

6    information that you would expect it to have when considering a

7    motion like this.  The defense says that we have seized the vast

8    majority of his assets, but Mr. Kvashuk himself will not

9    personally confirm that.  We know that $10 million in digital

10   currency was stolen from Microsoft.  It is true that that

11   currency was resold and it may well have been resold at a

12   discount.  But a note found in Mr. Kvashuk's house discussed

13   plans to spend $10 million.

14       There is evidence of extensive efforts to hide the money

15   trail.  In the defense brief, it says that Mr. Kvashuk made no

16   effort to hide assets whatsoever.  Well, that is certainly true

17   for the house and the car and the Fidelity account, the things

18   that are in plain view, but the investigation has shown that

19   Mr. Kvashuk made tremendous efforts to hide the transactional

20   record and the money trail in this case.  He used overseas

21   websites to resell the digital currency.  With these websites, it

22   can be difficult, if not impossible, to get transactional

23   records, and so far we haven't been able to get any.  He took

24   proceeds in the form of cryptocurrency.  Now, there's certainly

25   nothing illegal about using cryptocurrency, but if you are

1   committing fraud and you want to cover the money trail,

2   cryptocurrency has unique advantages over regular currency.  To

3   track cryptocurrency, you need to be able to follow the

4   blockchain.  Mr. Kvashuk used chip mixers to obliterate the

5   blockchain trail.  And just to show you what I'm talking about

6   here, Mr. Kvashuk had a Coinbase account, it was in his name, and

7   millions of dollars flowed from that Coinbase account into the

8   Wells Fargo account in his name.  What we don't know is where

9   that money came from before it came into the Coinbase account.

10  We should know.  We should be able to see this blockchain that

11  would show it to us.  But Mr. Kvashuk used the chip mixers, and

12  those obliterated the blockchain.

13      As far as the investigators know, there's only one purpose to

14  use a chip mixer, to destroy the blockchain, to obliterate the

15  money trail.

16      And using a chip mixer, by the way, is not free.  These

17  services charge a fee.  From the information the agents have so

18  far, there's some evidence that Mr. Kvashuk was paying a

19  15 percent fee to run his cryptocurrency through a chip mixer.

20  That adds up to hundreds of thousands of dollars.  But it was

21  worth it to him to spend hundreds of thousands of dollars so that

22  we could not work the money trail back.

23      Mr. Kvashuk made extensive efforts to conceal his identity

24  online.  Before Mr. Kvashuk launched the large-scale portion of

25  this fraud, he took weeks in November of 2017 to prepare.  We

1  have the activity logs from his devices, and they show him

2  researching and experimenting and trying different ways to

3  conceal this crime, using virtual machines to conceal the device

4  IDs that could help trace activity back to him, using VPNs and

5  proxy servers to conceal the IP addresses that, again, could help

6  us trace things back to him.

7       And, finally, we have direct evidence of additional --

8  possible additional assets.  The agents have identified bitcoin

9  wallets, possibly linked to Kvashuk, which hold about 1.4 million

10  in them at this time.  They are still working on confirming that

11  link.  Again, the use of the chip mixer makes it harder than it

12  should be to confirm links.  A notebook full of bank account

13  numbers found in the house.  Mr. Kvashuk's girlfriend came

14  forward, through counsel, to claim the notebook, but counsel has

15  refused to explain what this notebook is about and why it is full

16  of these bank account numbers.  $4,000 found in his girlfriend's

17  purse.  I'm not going to say anything more about that because the

18  rest of what the Court needs to know is covered by matters in our

19  sealed filings.

20       This is not speculation.  This is evidence of an extensive,

21  concerted effort to destroy the money trail.

22       Finally, Your Honor, I want to talk about the conditions that

23  are supposed to be in place to prevent flight in this case.  As

24  Magistrate Judge Theiler said at the hearing, it's pretty much

25  all the conditions that the Court has at its disposal, pretty

1   much all the tools there are.  And the reality is that even that

2   level of conditions will not prevent flight.  Taking his passport

3   is no assurance against flight.  There's nothing to prevent him

4   from getting another passport.  There's nothing to prevent him

5   from fleeing within the United States.

6       As courts in the Ninth Circuit have recognized again and

7   again, GPS monitoring does not actually prevent flight.  It can

8   be useful for many things, but it doesn't stop someone from

9   fleeing.  If these kinds of conditions truly prevented flight, if

10  they were really solid alternatives to detention, we would never

11  need to detain anyone in a risk-of-flight case.  We would simply

12  impose these conditions and we would rely on them to prevent

13  flight.  And there are some cases where the flight risk is small

14  or moderate where they may be appropriate, but in a case like

15  this, where the flight risk is as serious as it is here, there is

16  no real alternative to detention.

17      Unless the Court has questions, that's all I have, Your

18  Honor.

19          THE COURT:  Okay.  I understand.  Thank you.

20          MR. DION:  Thank you.

21          THE COURT:  Mr. Lowther.

22          MR. LOWTHER:  Your Honor, I have one witness and

23  argument.

24          THE COURT:  You may call your witness at this time.

25          THE CLERK:  Please come forward.  Actually, come over

 1   here first, please, and then you will be coming over on this

 2   side.  Yes.

 3       Raise your right hand.

 4                         ALLA LYNN,

 5       having been sworn under oath, testified as follows:

 6           THE CLERK:  Please take the stand.

 7       Please state your full name and spell it for the court

 8   reporter.

 9           THE WITNESS:  Alla, A-l-l-a, last name is Lynn, L-y-n-n.

10           THE COURT:  You may inquire.

11                     DIRECT EXAMINATION

12   BY MR. LOWTHER:

13   Q   What is your relationship to Mr. Kvashuk?

14   A   He's my nephew.

15   Q   And where do you live?

16   A   (No audible response.)

17   Q   Where do you live?

18   A   California, Canyon Lake.

19   Q   Okay.  Are you married?

20   A   Yes.

21   Q   And what are your and your husband's --

22           THE COURT:  Mr. Lowther, I'm sorry.

23           MR. LOWTHER:  Oh, sorry.

24           THE COURT:  There you go.  Thank you.

25   Q   What are your and your husband's occupations?

1  A    I am a dental hygienist, and my husband is a dentist.

2  Q    Ms. Lynn, what is your country of origin?

3  A    Ukraine.

4  Q    And are you a U.S. citizen now?

5  A    Yes.

6  Q    When did you emigrate from Ukraine and when did you become a

7  U.S. citizen?

8  A    I came here in 1998, and five years later, I became a

9  citizen.

10 Q    Okay.  Would you please describe for the Court your immediate

11 family?

12 A    My sister, who's here -- she's a Ph.D. of psychology, she has

13 her own business, she's a psychiatrist and she also does life

14 coaching with her clients -- my nephew, Volod, my parents in

15 Ukraine.  I also have my husband and my son in California and,

16 you know, my husband's family.  And we have a lot of cousins and

17 uncles who live here.

18 Q    And your sister who is present in court, what is her name?

19 A    Oksana --

20 Q    And what --

21 A    -- Romanyuk.

22 Q    I'm sorry.

23      And what is her relationship to Mr. Kvashuk?

24 A    His mother.

25 Q    Okay.  Now, how many people were present from your family at

1    the initial detention hearing?

2    A    Sixteen.

3    Q    And why aren't they here today?

4    A    It was our understanding that when they were here the first

5    hearing, they did not need to be here today.

6    Q    Okay.  Have you remained in contact with them during the

7    normal course of --

8    A    Yes, we do.

9    Q    And do they still support Mr. Kvashuk in his release?

10   A    Yes.

11   Q    Now, have you and Mr. Kvashuk's mother always had a close

12   relationship?

13   A    Yes, we have.

14   Q    Okay.  And where does she live?

15   A    She lives in Ukraine.

16   Q    Does she -- does she visit you relevantly -- or relatively

17   frequently here in the U.S.?

18   A    Yes, she does.

19   Q    Okay.  And have you always maintained a close relationship

20   with her?

21   A    Yes.

22            THE COURT:  Mr. Lowther, I understand that the rules of

23   evidence are relaxed in this, but I will tell you that you hurt

24   your own witness's credibility if you simply lead her.  Because

25   I'm not going to believe what you say; I'm going to believe what

```
 1    she says.
 2              MR. LOWTHER:  Of course.
 3    Q    So, again, what kind of relationship do you have with
 4    Mr. Kvashuk's mother, your sister?
 5              THE COURT:  Thank you, sir.
 6    A    We are very close.  We always have been.
 7    Q    Right.
 8         How long have you been close?
 9    A    Since, you know, the day we were born.  It's only two of us,
10    so it's a very close relationship.
11    Q    And have you maintained that same relationship with
12    Mr. Kvashuk?
13    A    Yes.  He's my only nephew.  He's like my second son.
14    Q    Could you just describe for the Court his -- could you
15    describe him personally for the Court?
16    A    He's very polite.  Courteous.  He's always calm.  His friends
17    would say he's very reliable and kind, always willing to help
18    everybody.
19    Q    Are you familiar with his reputation among friends and
20    family?
21    A    Yes.
22    Q    What is that reputation?
23    A    Everybody loves him.  Nobody has anything bad to say about
24    him.
25    Q    When did he immigrate to the United States?
```

1    A    2015.

2    Q    Did you play any part in that decision?

3    A    Yes.  He came originally for my wedding, with my parents, and

4    then I actually asked him to stay, knowing that he had some

5    threats in Ukraine and it was really dangerous at that time.  So

6    I felt like I feared for his life.

7    Q    Could you describe --

8    A    I begged him to stay, actually.

9    Q    I'm sorry.

10        Could you describe that situation in a little more detail for

11   the Court?

12   A    In 2014, he was a student at the Academy, a university in

13   Ukraine.  There was -- we all know -- in Ukraine, they had, it's

14   called like a revolution of freedom, where students went to the

15   capital of Ukraine hoping for better future.  They wanted Ukraine

16   to become a part of the European Union.  So they had, like, a

17   peaceful walkout in the capital, hoping, you know, for change in

18   the government, you know, change of the corrupt government, and

19   just trying to, you know, have a better future.  And he

20   participated several times in a couple of those walks.

21        From my understanding, they had him on the camera with his

22   friends.  And his mother, she's volunteering in the East with a

23   tour, they're soldiers, who are fighting for their freedom, and

24   because she's volunteering and they had him as a participant,

25   they received threats telling her, pretty much, if you keep

1  helping them, we know where your son is at, and we have access to

2  him all the time.  When I found that -- it was just like I was

3  afraid for his life -- I did not want him to go back.

4  Q    Are you concerned for his mother's safety?

5  A    Yes.  I actually have begged her to stay and move here, but

6  our parents are old and sick.  And she actually told me that she

7  just cannot leave them behind.  That's the only reason she is

8  staying back.  She's willing to risk, you know, everything she

9  has because she has to take care of her parents.  And I'm not

10 able to move back.  So she's the only one who can take care of

11 them, and their health is not that good.  So she has to be there

12 for them, to take care of them.

13 Q    The government asserts that during the search of your

14 nephew's residence, the agents found a note concerning -- that

15 Mr. Kvashuk supposedly wrote concerning how he's going to spend

16 $10 million.  Are you surprised to hear about that note?

17 A    My sister does life coaching, and one of her practices she

18 does with her clients is, like, affirmation.  You have your

19 dreams, you have to write them down, and you have to affirm them

20 every day.  And that's what it was.

21 Q    So it didn't surprise you?

22 A    No.

23      I do that all the time too.

24 Q    Now, are you -- you mentioned that you've, obviously, been

25 close with your nephew and your sister their entire lives,

 1  obviously.
 2      Are you aware of Mr. Kvashuk posing any danger, financial or
 3  physical, to anyone at any point while he was in Ukraine or after
 4  he immigrated here?
 5  A   No.  Never.  Not in Ukraine, not here.
 6  Q   I want to ask you, do you have any knowledge of the facts of
 7  this case outside what you have heard at the initial detention
 8  hearing or in conversations with me generally?
 9  A   No.
10  Q   Okay.  And have you discussed the case with your nephew at
11  all?
12  A   No.
13  Q   But you're aware he's charged with, at this point, mail
14  fraud, which is a felony, correct?
15  A   Yes, I'm aware.
16  Q   And you're aware that the alleged amount of loss in the case
17  is over $10 million?
18  A   Yes, I'm aware of that.
19  Q   And as you heard earlier, you understand that at this point
20  the sentence that he's facing is a 20-year maximum penalty, but
21  the recommended sentence, as you heard the government mention, is
22  87 to 108 months.  Are you aware of that?
23  A   Now I am.
24  Q   Okay.  Now, knowing all of that information --
25  A   Right.

1    Q    -- would you be willing to serve as a financially responsible

2    party on his bond if the Court sees fit to release him pending

3    trial?

4    A    Yes.

5    Q    Now, what are your assets, briefly?

6    A    My personal assets that I have, about 200-plus in my

7    investments, and also, my husband and I, we own a million-dollar

8    home in California.  That's just, you know, the bulk of it, not

9    details.

10   Q    Okay.  And you understand that if the Court sets a bond, and

11   if the Court allows you or requires you to be a financially

12   responsible party, if Mr. Kvashuk flees the jurisdiction or

13   violates any condition of his release, you would be responsible

14   for the entire amount of that bond?

15   A    Yes, I am aware of that.  Yes.

16   Q    Are you aware of any hidden assets that your nephew has?

17   A    No.  I don't know anything about his finances.

18   Q    Okay.  Has anybody promised to repay your bond obligation --

19   A    No.

20   Q    -- if he flees?

21   A    No.

22   Q    Okay.

23   A    No.

24        MR. LOWTHER:  That's all the questions I have, Your

25   Honor.

```
 1              THE COURT:  Thank you.
 2         Mr. Dion.
 3              MR. DION:  Thank you, Your Honor.  If I could just have
 4    a second, please.
 5                        CROSS-EXAMINATION
 6    BY MR. DION:
 7    Q    Good afternoon, Ms. Lynn.
 8    A    Good afternoon.
 9    Q    You testified that you are very close to Mr. Kvashuk, right?
10    A    Yes.
11    Q    You said that he is like a second son to you, correct?
12    A    Right.
13    Q    And you said that to emphasize how close the relationship is,
14    right?
15    A    He's my nephew.
16    Q    But you went beyond that.  You said that he's like a second
17    son because you wanted to emphasize how close you are, correct?
18    A    Yes.
19    Q    As a second son, does Mr. Kvashuk usually tell you about
20    major developments in his life?
21    A    No.  Because he lives here, and I'm really busy, I have a
22    really busy life in California, and we really don't talk details.
23    Q    So you are very close, but he does not tell you about big
24    developments in his life?
25    A    I love him, but we do not talk, like, financial details.  He
```

1  doesn't know anything about my finances; I don't know anything

2  about his.

3  Q    Oh, I didn't ask about financial details.  I just asked if he

4  told you about big developments in his life.

5  A    Most of them, yes.  When he gets a new job, when he -- just,

6  like, basic, you know, like, what we share.

7  Q    Buying a house could be a big development in someone's life,

8  wouldn't it?

9  A    Yes.

10 Q    Did Mr. Kvashuk tell you when he bought the lakeside home in

11 Renton in 2018?

12 A    Yes.

13 Q    Did he tell you what the house cost?

14 A    No.  I didn't ask.

15 Q    Did he tell you how he paid for the house?

16 A    I just assumed that he just had a mortgage like everybody

17 else.  I don't ask.  I don't pry in people's personal lives.

18 Q    Sure.  But I just want to make sure my question is clear,

19 because I'm not asking whether you pried.  I'm asking whether he

20 said anything to you about how he paid for the house.

21 A    No.

22 Q    He never told you that he had paid over $1.6 million in cash

23 for that house, correct?

24 A    No, he never has.

25 Q    Did he tell you when he bought the Tesla sports car?

1    A    I think I found out when I actually came to visit, and then

2    he had the car, I saw it.

3    Q    That was the first you had found out about it?

4    A    Right.

5    Q    Before 2018, was Mr. Kvashuk rich?

6    A    No.

7    Q    He wasn't rich?

8    A    No.  I don't know.

9    Q    You mentioned the protests in the capital of the Ukraine.

10   A    Yes.

11   Q    Those were in 2014, right?

12   A    Right.

13   Q    And those were protests against the current government,

14   weren't they?

15   A    The government at that time.

16   Q    Yes.

17        People were protesting that government?

18   A    They were not protesting the government.  They were doing a

19   walkout in support for Ukraine to become a part of the European

20   Union.  That was the question at the time that was to be voted

21   on, and that's what they were walking out for, asking -- you

22   know, hoping that they will adapt to that and that Ukraine can

23   become a part of European Union so that way, you know, they had

24   hope for a better future.

25   Q    Well, haven't you said before that these were protests that

1    angered the government?

2    A    They were just, like, student protests.

3    Q    So your testimony is that they were protests, correct?

4    A    Right, I guess.  I wasn't there, so that's -- yeah.

5    Q    But you are here testifying about what happened, aren't you?

6    A    Right.

7    Q    Are you saying that you don't know what happened in the

8    Ukraine in 2014?

9    A    I know what happened.  I just wasn't present.  So I don't

10   know every little detail of it.  So from my understanding,

11   personally, of how I felt and what I understood, that's my

12   understanding of that.

13   Q    And the government that they were protesting in 2014, that

14   government fell, didn't it?

15   A    They just had a different president after that.

16   Q    The old government has been replaced with a new government,

17   hasn't it?

18   A    They had regular elections, and they had a different

19   president.

20   Q    And the people who were in power then are now out of power;

21   isn't that right?

22   A    Not everybody.  It's different.  It depends on the

23   parliament.  There are different groups and ...

24   Q    You said that Mr. Kvashuk received threats.

25   A    Yes.

1   Q    Did you hear anyone threaten him?

2   A    Did I hear?  No --

3   Q    How do you know he received threats?

4   A    -- not myself.

5        My sister showed me.  She had text messages.  And I know she

6   actually had a letter written to her.

7   Q    From who?

8   A    I'm not sure.  It was the people -- I'm not sure who exactly

9   it was.  It wasn't like a written, you know, signed note.  I

10  don't remember details.  It was in 2015.  It's been a few years.

11  Q    Okay.  Well, I just want to make sure we understand what you

12  know about this.

13  A    Okay.

14  Q    So what you know about the threats is that there was a letter

15  to your mother {sic}, but you don't know who it was from,

16  correct?

17  A    To Volod's mother, my sister.

18  Q    To Volod's mother.

19       But you don't know who that letter was from?

20  A    The people who were supporting the East.  You know, the

21  fighters that were fighting against Ukraine.

22  Q    You just said you didn't know who it was from.  Are you now

23  saying --

24  A    Well, I assumed.

25  Q    Do you assume that, or do you actually know that?

 1    A    I don't know exact details.

 2    Q    What about the text messages?  What do you know about those?

 3    A    I just saw the messages saying if she keeps helping the

 4    Ukranian fighters as a volunteer, that there will be consequences

 5    and they know where her son is at at all times.

 6    Q    Who were those text messages from?

 7    A    I don't know.

 8    Q    You said that the $10 million note, the note about how to

 9    spend the $10 million, was an affirmation?

10    A    Yes.

11    Q    How do you know that?

12    A    Because that's what we do.  My sister, like I said, she's a

13    life coach.  She tells us -- it's just what we do with our family

14    and everybody.

15    Q    Have you written a note about how you will spend $10 million?

16    A    I have different dreams.  It's you have a dream, you write it

17    down, and you affirm it every day.

18    Q    Have you written a note about $10 million?

19    A    No.

20    Q    Do you know if anybody else in your family has written a note

21    about $10 million?

22    A    Yes.

23    Q    Who?

24    A    Several people.  My cousins that I know in Ukraine, my uncle

25    in Ukraine.

1    Q    These people have written notes about how they are going to

2    spend $10 million?

3    A    It was not a note on how to spend $10 million.  It's I have a

4    dream, I'm envisioning it now, and that's what I would like.

5    Q    That's not my question.

6    A    It was not a plan.

7    Q    My question is, do you know anybody else who has written a

8    note about how they will spend $10 million?

9    A    Not how they would spend $10 million, no.

10   Q    Did Mr. Kvashuk tell you that he wrote that note as an

11   affirmation?

12   A    No.

13        MR. DION:  I don't have any more questions.

14   Thank you, Ms. Lynn.

15        THE WITNESS:  Thank you.

16        THE COURT:  Redirect?

17        MR. LOWTHER:  No, Your Honor.

18        THE COURT:  Before you step down, I have a question.

19                          EXAMINATION

20   BY THE COURT:

21   Q    As I understand it, the defendant came to this country in, by

22   my notes, April of 2015?

23   A    Right.

24   Q    And I thought I heard you just say that these threats were

25   received in, I'm not sure you said April, but you said spring of

1    2015.

2    A    I'm not sure of the exact time frame.  I really didn't put

3    the time frame on that.  I'm not sure.

4        It was happening from after he left Kiev and it was

5    happening, like, after the walkout that they had.

6    Q    Well, ma'am, that's not what you said in your direct

7    testimony.  You gave a specific time and you said in 2015.

8        What I'm trying to find out is the temporal relationship

9    between the defendant leaving, his mother contacting the police,

10   and he's either already in the United States or he's on his way

11   to the United States.

12   A    I'm not sure about the time frame, when exactly they got the

13   notes.  I think it was, like, that spring of 2015, but I'm not

14   exactly sure of the time frame.

15           THE COURT:  Thank you.

16       Do either counsel wish to follow up on the Court's --

17           MR. LOWTHER:  I could follow up.  I'm sorry.

18           MR. DION:  I have nothing else, Your Honor.  Thank you.

19           MR. LOWTHER:  I can clarify that issue just with a

20   question and then a note -- with, actually, one of the sealed

21   exhibits.

22                       REDIRECT EXAMINATION

23   BY MR. LOWTHER:

24   Q    When was your wedding?

25   A    April 2015.

1         MR. LOWTHER:  Thank you.

2         THE COURT:  All right.  You may step down.

3         MS. LYNN:  Thank you.

4         THE COURT:  Mr. Lowther.

5         MR. LOWTHER:  I just have argument, Your Honor.  No

6    further witnesses.

7         THE COURT:  All right.

8      Mr. Dion, do you wish to make any further argument?

9         MR. DION:  Not unless the Court has any questions.

10   However, I did hear Mr. Lowther say something about sealed

11   exhibits.  I didn't file any exhibits under seal and I haven't

12   seen any sealed exhibits, Your Honor.

13        MR. LOWTHER:  I'm referring to the sealed exhibit that

14   Mr. Kvashuk's former attorney filed with the original response to

15   the detention order --

16        MR. DION:  Okay.  Thank you, Your Honor.

17        MR. LOWTHER:  -- with the asylum application.

18        MR. DION:  Thank you.

19        THE COURT:  I have that as Document 11, 18 pages, which

20   were sealed.  They wouldn't need to seal part of it since I

21   believe it's in Ukranian, but ...

22        MR. DION:  I apologize.  I was confused.  I thought he

23   might have been talking about a new filing in connection with

24   this motion.

25        THE COURT:  Mr. Lowther, you are up, please.  Argument.

1      MR. LOWTHER:  And most of that exhibit, actually, is in

2  Ukranian, but like --

3      THE COURT:  I have read it.

4      MR. LOWTHER:  -- every other page is a translation.

5      THE COURT:  I have read it, sir.

6      MR. LOWTHER:  Out of an abundance of caution.

7      Your Honor, obviously, as you mentioned earlier, 3142, that's

8  the statute that controls why we are here today, even though the

9  procedural mechanism is 3145, and the two issues are risk of

10  flight and danger to the community.

11      There has been --

12      THE COURT:  You are going to need to go a little slower.

13      MR. LOWTHER:  There's been much back and forth between

14  the government and us -- the motion for detention and the

15  response, the memorandum in support, the motion to revoke

16  detention order, et cetera -- but the government has stated its

17  position generally in the memorandum in support of detention,

18  that Mr. Kvashuk should be detained because, number one, Ukraine

19  has no extradition for its citizens -- and he clearly is a

20  Ukranian citizen -- the length of the sentence that could be

21  imposed in the case, and, thirdly, Mr. Kvashuk's access to funds

22  to flee.

23      In a more recent filing, the response to my motion to revoke

24  the detention order, the government essentially restated the same

25  position, but said the first reason would be the incentive to

1   flee, the means to flee, and, essentially, that location

2   monitoring does not negate the risk of flight.

3        Now, I will agree with number three to begin with, and I also

4   agree with the government's legal assertion that a defendant

5   being on location monitoring through an ankle monitor, obviously,

6   does not, by law, make him or her not a risk of flight.  But at

7   the same time -- well, I just wanted to address that issue

8   because there will be no need to address it later.

9        So the government, even at this hearing, as you mentioned

10  earlier, still has the burden to prove, by a preponderance of the

11  evidence, that Mr. Kvashuk is a risk of flight, and by clear and

12  convincing evidence, that he is a danger to the community.

13       Now, to address this in the government's terms, number one,

14  what is the incentive to flee?  It's our position that

15  Mr. Kvashuk has no incentive to flee the jurisdiction whatsoever.

16  He's 25 years old.  As you're aware, he's a software engineer by

17  training and by trade.  He's lived in Washington the entire time

18  he's been in the United States, albeit since 2015.  He works here

19  in Seattle.  And his significant other, who's in court today,

20  that Ms. Lynn pointed out, she lives in Seattle mand she also has

21  a pending asylum claim, so she's anchored to the community.  The

22  asylum claim in itself, as you heard, is a very real claim.

23       This conduct, this alleged conduct, dates from 2017 into

24  2018.  The government states that it started in or about April of

25  2017 through October.  Then the majority of the allegations take

1    place from November 2017 to March 2018.  This asylum claim was

2    long before that.  This was back in 2015.  So despite the

3    government's attempt to essentially minimize that through its

4    cross-examination of Ms. Lynn, I think that you can see that the

5    threats are very real.  So even a conviction and sentence here in

6    the United States would certainly be a better option than his

7    returning to Ukraine, especially since he's turned his back on

8    that country by applying for asylum here.  And the best I can

9    offer is the exhibit that I mentioned was under seal that, again,

10   I don't need to discuss, obviously, in open court.

11           THE COURT:  Well, counsel, I'm going to have to ask you

12   a question out of it, though.  It represents in there that there

13   are threats -- we talked about that -- mobile phone and social

14   networks, and dates them as the last month of 2015.

15           MR. LOWTHER:  Correct.

16           THE COURT:  That's after the claim of asylum.

17           MR. LOWTHER:  Well, I think you actually see that's in

18   June of 2015.  The way the dates are written, you know, the day

19   and the month is transposed -- are transposed.  I guess if that's

20   the right word, "transposed."

21           THE COURT:  It's European.  I don't think it's

22   transposed.

23           MR. LOWTHER:  Well, it's correct given the document that

24   you are reading, obviously.

25        But Mr. Kvashuk came here for Ms. Lynn's wedding, as she

1    mentioned, in April of 2015.  Of course, the protests happened

2    before that, but the threats happened after that, in June.  He's

3    here on a B-2 visa initially, he's here for his aunt's wedding,

4    he's here on this temporary visa, he overstays the visa while

5    they're having this discussion -- and, of course, I'm not

6    testifying to this; I'm extrapolating this from the evidence and

7    I'm also relying on the prior pleadings that the Court has -- so

8    while he's here on the B-2 visa, even though it's an overstay, at

9    that point, with consultation with his aunt and his family, he

10   makes the asylum application.  So you see those dates.  He's here

11   for April 2015.  The threats come in while he's simply on a visa

12   to visit.  But when the reports are made, given those dates, then

13   the asylum application happens right after that.

14        THE COURT:  He's here on a B-2 visa, isn't he?

15        MR. LOWTHER:  He was.  Now it's simply a pending asylum

16   application with a work permit.  It was a visa just to visit

17   initially.  When he applied for asylum, his status was adjusted

18   to where he is simply, I guess pending asylum would be the

19   easiest way to say it, with the permission to work, until Customs

20   and Immigration -- excuse me, Customs and Immigration Services --

21   Citizenship and Immigration Services makes a final determination.

22        THE COURT:  I mean, counsel, one plausible

23   interpretation of this is that your client moves to this country,

24   is here, his mother then contacts the police and says, oh, there

25   are death threats against me, against my son, they know where he

1    is all the time, and he then has asylum, which would permanently

2    allow him to remain in the United States.  That sounds, and I

3    will use the word intentionally, manufactured.

4         MR. LOWTHER:  Well, that could be a plausible

5    explanation, but there's no evidence to support that,

6    particularly considering that the alleged conduct in this case

7    took place long after that, two years later.  So there would

8    be -- I apologize.  Were you asking another question?

9         THE COURT:  No.  Go ahead and finish.

10        MR. LOWTHER:  Oh.  Sorry.

11    So the conduct alleged in this case, which is the only

12    criminal conduct alleged, post dates that by two years.  So what

13    would be the purpose of his manufacturing this asylum application

14    to say, oh, I'm not a risk of flight if I get caught.  I

15    understand that someone could simply want to immigrate to the

16    United States and not have a very good reason.  But I think that,

17    you know, to counter that point, I think two points.  Number one,

18    again, I don't think the government has shown that, that it is

19    some kind of manufactured accusation, and, number two, not to be

20    repetitive, but I think that the government's allegations of the

21    conduct -- so that means I'm going to be repetitive, right? --

22    that the government's allegation of the conduct would take any

23    kind of manufacture out of that.

24        THE COURT:  Well, I guess I have vast experience at this

25    point of people who come to the border and ask for asylum.  I

1    don't understand the government's position to be that he's

2    seeking asylum in the United States in order to commit crimes.

3    The crimes come after he files this asylum.

4            MR. LOWTHER:  Of course.

5            THE COURT:  It doesn't make good sense, if you know the

6    law, which is that it's going to torpedo his asylum application

7    and he's going to end up going somewhere if he's not permitted to

8    stay in the United States.

9        So you seem to conflate the two together and say, well, you

10   have to examine the asylum application somehow saying, you know,

11   it needs to be linked to this subsequent criminal conduct.

12   That's not what I think is before the Court.

13           MR. LOWTHER:  No, and that's not my position.  I will

14   state that I made that argument somewhat preemptively in the

15   pleading.  But today my point -- well, I mean, just in case it

16   arose.  But that's not what the government raised today.  My

17   point, maybe so inarticulately, is that I think that the Court

18   can evaluate the credibility of Mr. Kvashuk's aunt and her

19   knowledge, even though she wasn't literally there, families

20   discuss matters such as that, and there's no indication

21   whatsoever that the asylum application is contrived.  Of course

22   millions of those applications are contrived.  I understand that.

23   I mean, obviously, I don't have the Court's experience with that,

24   but I do have experience with everybody coming across for

25   whatever reason, and, well, I'm just going to apply for asylum.

1    But that doesn't seem to be the case here in any way.  I mean,

2    you see the reports that were made in Ukraine.  Of course, nobody

3    is subject to a false statement in this court for making a police

4    report in Ukraine.  But those are legitimate, authenticated

5    documents where the reports were made.

6            THE COURT:  Let's see if we can agree on something.  I

7    don't think the application for asylum has anything to do with

8    the criminal charges that are pending against your client.

9            MR. LOWTHER:  Understood.

10           THE COURT:  And I'm not sure I understand.  I mean, it

11   may have a huge consequence because of it, but I'm not sure that

12   the government is contending that there are, and I'm not sure why

13   that is becoming a focus of this case.  The question is, did

14   your client commit mail fraud or did he not.  And, frankly, his

15   aunt saying, well, I don't know where the house came from, or

16   whatever, none of those really address that issue of, is he a

17   risk of flight, and then if he is, we get into that second set of

18   questions.  So that to me is what we're trying to decide here

19   today --

20           MR. LOWTHER:  Right.

21           THE COURT:  -- so why don't we stop talking about

22   asylum.

23           MR. LOWTHER:  And I made as much of that point as I

24   needed to make.  I wanted to answer your question, though.

25   Because, obviously, the government's cross-examination, just to

 1    clarify my point on it, or my train of thought about it, the

 2    government's cross-examination certainly implied that the asylum

 3    claim was not really a big deal and it would be no problem for

 4    him to go back to the Ukraine and live safely forever.  And

 5    that's, obviously, not our position based on the pleadings and

 6    the arguments here.

 7        So the second part would be --

 8            THE COURT:  Well, let me ask you one question.

 9            MR. LOWTHER:  Yes.  Sure.

10            THE COURT:  Let's assume he doesn't go back to the

11    Ukraine, but he's got to leave the United States, because if he

12    stays in the United States, he's going to be subject to criminal

13    prosecution.  Why should I not -- or why should I be concerned

14    where he goes?  You know, he's going to go somewhere, if he

15    flees.

16            MR. LOWTHER:  I don't think you should be concerned

17    about it at all.  But in all of the government's pleadings and in

18    the cross-examination today, the asylum issue was raised, and

19    that's why I simply wanted to address it, because I didn't want

20    to give the appearance to the Court that I'm trying to sidestep

21    this obvious, terrible issue, that it's not really a big deal

22    when it is, and that was my only intention of bringing that up.

23            THE COURT:  Thank you.  Well, let's -- I don't want to

24    take you off your script, but let's --

25            MR. LOWTHER:  That's okay.

1           THE COURT:  The government, particularly in its rebuttal

2    to your motion, raises a great deal of evidence in regards to

3    what would be basically guilt and innocence of the mail fraud

4    case.  I don't feel like you've had a chance to respond to that,

5    so I would like you to do that now.

6           MR. LOWTHER:  I haven't.  Do you mind if I address the

7    means to flee, which would go directly into the strength of the

8    evidence?

9           THE COURT:  Sure.

10           MR. LOWTHER:  Because I'm just going down the statute,

11    and I would like to make a couple of points on the means to flee

12    so that I can more fully develop that last part.

13      And, again, this is still according to the statute, or in the

14    text of the statute and the government's assertion in the motion.

15    So in this hearing, as I mentioned earlier, the government still

16    has the burden to prove, by a preponderance of the evidence, that

17    there's a risk of flight.  In this case, by raising the issues of

18    the means to flee, particularly the means to flee and the

19    strength of the evidence, the government appears to be shifting

20    that burden to us to prove otherwise.  And that's simply not the

21    case.  We don't have that burden, for lack of a better way to say

22    it.  And I'm sure the Court is aware of that, but I wanted to

23    underscore it.  Because if you notice in the government's

24    pleadings, he may have money, it's likely that he would have

25    money, he could have money, probably would have money.  As a

1   matter of fact, today in the presentation, the latest was that

2   there is a Coinbase account or a cryptocurrency account that

3   could possibly be linked.  Then, as the government rightly

4   mentions, Mr. Kvashuk doesn't have any legal obligation to

5   disclose his assets to Pretrial Services, but if he doesn't do

6   that, the Court is uninformed, and if the Court is uninformed

7   about the assets, you should not release him pending trial.

8           THE COURT:  Well, let me try to put some different words

9   in your mouth, which is one of my favorite things to do.

10      You have no burden whatsoever.  The defendant is entirely

11  free to say nothing to Pretrial Services and has no obligation

12  sitting here in this courtroom today.  The question to me, then,

13  is what evidence do I have?  And what evidence I have is, from

14  the defendant, none.  And it's up to me to judge the value or the

15  importance or the weight of what the government has brought

16  forward.  That's how I interpret their --  You know, if you

17  wanted to be able to rebut some of their evidence, you would be

18  able to do so.  Instead, you're relying on the burden-of-proof

19  argument, which sometimes works and sometimes doesn't.

20          MR. LOWTHER:  Well, I'm relying on the burden-of-proof

21  argument because, again, that's what the statute requires.

22      And the Court can look at the facts of the case to see that

23  the government hasn't made its burden, and I'll address those

24  reasons why on means to flee and the strength of the evidence.

25  It's been over a month since the search warrant has been

1  executed.  So all the computers, all the devices, all of this

2  evidence has been seized.  Frankly, you have got two of the most

3  proficient agencies involved in financial crime investigating.

4  You've got the IRS and you've got Secret Service, and, still,

5  we're with nothing more than conjecture about what could possibly

6  be out there.  And, again, there's still nothing after all of

7  that.  At first we seized everything, we believe that we have all

8  these assets, we're looking through it now.  Again, you know,

9  this hearing happened as quickly as this hearing could happen,

10  but at the same time, there's been a lot of time to investigate,

11  and there has been no evidence.  And I'm not sitting here saying,

12  of course, he has assets, they just can't prove it, so you have

13  to turn a blind eye to it.  That's not what I'm saying.  I'm

14  saying that the statute, as Your Honor knows better than I,

15  granted, requires the government to prove that, and the

16  government, for those reasons, hasn't proved it, just like with

17  the strength of the evidence.  So I understand that's a factor.

18  Clearly, it's one of the enumerated factors in 3142, but it's

19  somewhat of a disfavored factor for a couple of reasons.

20          THE COURT:  Yes.  It's basically the evidence.  I know

21  that standard well.

22      But what do I have before me?  I have before me some young

23  man who's 25 years old and pays 1.6 million for a house, and

24  which you say, well, you have no burden.  But you suggest, well,

25  his father maybe gave him the money or it could have been an

1   inheritance.  Well, your own witness today kind of trashed that

2   notion.

3          MR. LOWTHER:  Uh-huh.

4          THE COURT:  And then, you know, what was it -- Teslas

5   are apparently expensive -- I can't imagine a car costs $160,000,

6   but somehow he pays cash for that.

7      All of a sudden we're starting to get into where did that

8   money come from, and they have demonstrated, to my satisfaction,

9   that there was a series of transactions in regards to his

10  employment at Microsoft whereby a lot of cryptocurrency, whatever

11  that may be, was generated, and they were in your client's

12  possession.  I need you to address that because that's seemingly,

13  to me, a fairly strong foundation to begin to build their case

14  on, which is, where did this young man come up with $1,750,000,

15  or whatever it is.

16         MR. LOWTHER:  Well, if the government proves that his

17  legitimate income is $116,000 a year, and that income came from

18  what the allegations are, that would be strong evidence regarding

19  the -- for whether or not he is guilty of the offenses charged.

20  I understand it's only one count of mail fraud, but we're

21  charging a scheme.  I get that.  So that would be evidence

22  towards that.

23     On the other hand, not to state something completely contrary

24  to what you just said, but that's beyond the scope of what I

25  submit the hearing is today.  It's not whether the evidence is

1  strong enough, seemingly, based at this early stage, to convict

2  him; it's whether it's going to impact his flight.  Every

3  magistrate judge who considers detention -- I'm not talking cases

4  where there's a $50,000 aggravated identity theft, where nobody

5  really has any objection to it; I'm talking about cases where the

6  statute really has to be considered and applied based on the

7  evidence -- every magistrate judge that considers bond in a case,

8  the evidence is strong.  There's either an affidavit in support

9  of a complaint that establishes probable cause or there's an

10  indictment.  District court judges, I understand that your bond

11  decisions are limited essentially to hearings like this, to

12  revoke detention orders, or when someone comes in to plead to an

13  information.  Well, guilt is a foregone conclusion at that point,

14  but that doesn't mean bond isn't allowed.  So to the extent that

15  the evidence seems strong, I mean, that's why -- and I understand

16  that you understand the argument -- but that's why it's a

17  disfavored factor.  Who can really rebut all of the government's

18  evidence on the day of arrest?  We're still a month into this,

19  and we're not able to completely debunk the government's theory

20  with a witness, but at the same time, even assuming what the

21  government says is true -- which, obviously, Mr. Kvashuk has

22  denied with his plea of not guilty -- but even if the

23  government's allegations are true, that doesn't mean that he's a

24  risk of flight and it doesn't mean that he would have any means

25  to flee.

 1       And the obvious question that would follow that is, but what

 2   assets does he have to flee?  And we don't have anything except,

 3   well, if he stole this much money, then he must have something

 4   left, even though the assets that the government has

 5   identified -- and I mention this ever so briefly in the motion to

 6   revoke the detention order -- Mr. Kvashuk had no idea that he was

 7   a target of a federal criminal investigation.  Yeah, he was

 8   interviewed by the fraud unit at Microsoft, internal.  There were

 9   no law enforcement agents there.  That was back in, actually,

10   early 2018.  He was terminated in June.  He didn't have any

11   reason to think that he needed to hide anything, to secret

12   anything.

13       So the assets that are obvious -- and the government did

14   mention that, the obvious assets -- they're seized and held.

15   When I say "held," I mean, obviously, there's a lis pendens on

16   the house.  He's not been thrown out of it.  The statute doesn't

17   allow it.  But whatever else was there, the government has

18   control, and he does not.

19       And, lastly, if I just may proffer this -- and just take it

20   for what it's worth because I don't have a witness with it -- the

21   notebook that the government mentions is the property -- there's

22   a notebook with multiple bank account numbers that Ms. Leonard,

23   Mr. Kvashuk's significant other, said was hers.  She works for

24   Mr. Kvashuk's, if you follow this, cousin's husband, and he owns

25   a trucking company.  She does work for him.  That's where she's

1   earned the money that she's made over -- the $4,000.  Actually,

2   that was a gift.  But she does actually work before all -- or did

3   actually work before this happened.  And those were bank accounts

4   to where she was to place debts owed by that company into those

5   accounts.  And I'm saying that for what it's worth.  The

6   government is going to follow up on that.  They're welcome to

7   speak to Ms. Leonard.  But I just wanted to take care of the

8   specter of that.

9           THE COURT:  Didn't she decline to speak with them?

10          MR. LOWTHER:  She was subpoenaed to the grand jury, and

11  Mr. Kvashuk's former attorney arranged for her to have counsel,

12  and on advice of her counsel, she declined to answer any

13  questions about the notebook.  But as Mr. Kvashuk's attorney, I'm

14  fully aware of what the notebook was and remains.

15      Now, pecuniary harm --

16          THE COURT:  While I've got you stopped for a second --

17          MR. LOWTHER:  I'm sorry.

18          THE COURT:  -- have you got Exhibit 7?

19          MR. LOWTHER:  I do.

20          THE COURT:  What is the timing of the relation of the

21  closure of the first two Microsoft accounts and the discussion

22  with the fraud unit?

23          MR. LOWTHER:  The fraud unit was March of 2018, and his

24  termination was June.  And according to the government's graph,

25  that would be November or December.  Mr. Dion can correct me if

1    I'm wrong.

2         MR. DION:  Actually, Your Honor, the Microsoft

3    interviews were in early May of 2018.

4         THE COURT:  All right.

5         MR. LOWTHER:  May.

6         THE COURT:  Please continue.

7         MR. LOWTHER:  I said March.  Reasonable --

8         THE COURT:  You answered my question.

9         MR. LOWTHER:  Okay.

10       And, lastly -- well, next to last -- I want to talk about

11   pecuniary harm.  You just mentioned that at the start of the

12   proceeding, and I don't know if I understood your comment

13   correctly, but I don't know if you said that you don't find that

14   the danger to the community part of the statute applies.

15        THE COURT:  I haven't made any rulings yet.

16        MR. LOWTHER:  Okay.  So regarding pecuniary --

17        THE COURT:  I was simply trying to set out my

18   understanding.  This is an area in the Ninth Circuit which seems

19   to be moving in several directions at the same time.  This is

20   what I understand my obligations are.

21        MR. LOWTHER:  It's a bit of a moving target, I agree.

22   And you had just mentioned that that part of the statute doesn't

23   apply.  I just misunderstood the way you said that.

24       So pecuniary harm, I want to mention that.  It's very

25   significant.  The magistrate judge found that Mr. Kvashuk poses a

1    pecuniary harm really sua sponte.  The government didn't advance

2    that argument at all, and I would say rightfully so.  There's no

3    evidence whatsoever that Mr. Kvashuk -- and you can hear that

4    from the government's allegation and you can hear that from his

5    aunt who testified today -- there's no evidence that he poses any

6    pecuniary harm or certainly any violent crime to any person or

7    entity before.  And I have mentioned his aunt's testimony simply

8    because the obvious response to the government, he's only been

9    here since 2015 and outside of the allegations in this case.  I

10   would say that this case is different from the typical case where

11   courts are justified in finding that there's a pecuniary danger.

12   For example, according to the -- well, let me just say for this

13   case, according to the government's own allegation, Mr. Kvashuk

14   used his knowledge as a software engineer and he used his

15   employment, specifically his position as a developer and tester

16   at Microsoft, to be able to access the Microsoft online store

17   with a tester e-mail.  I don't want to get into the minutia of

18   that, but you get the idea.  He's a developer, he's a tester, he

19   has an e-mail, he has a TIP card that he can use, and according

20   to the government's allegations, that's how he did that.  Well,

21   number one, he no longer works there anymore.  So he doesn't have

22   access to Microsoft's online store or any other type of place.

23   When I mention the typical case in which pecuniary harm is found,

24   which, again, I know you know better than I, typically security

25   fraud cases, aggravated identity fraud cases, sometimes there's a

1    defendant who, respectfully, has no education, no skill, and it's

2    one fraud after the other.  If you release his personal bond,

3    there's really no, whether it's a compulsion or just no other

4    means of income, these people go out and they either steal money

5    from people or whatnot.  That's not the type of case here.  So I

6    just don't think, respectfully, that there's any evidence to

7    support the finding that he's a pecuniary danger.  And that was

8    based on the nature and circumstances, if I'm quoting the

9    detention order correctly, the nature and circumstances of the

10   offense.  And, respectfully, they don't exist.

11          THE COURT:  Well, counsel, I think it's in your briefing

12   that says he's a software engineer, he needs to stay -- I'm going

13   to imply something here -- in the United States because the only

14   people who are going to hire him is a software firm where he's

15   currently working.

16       Now, the last time I checked, you know, if that's the kind of

17   crime --  I'm not saying he's guilty.  I'm just saying that's the

18   charges against him, that's what some of the evidence is, is that

19   he used these skills, and your position is, I can send him back

20   into that exact same situation, but he's going to behave himself

21   this time because he's not going to go steal, you know, social

22   security checks out of mailboxes.

23          MR. LOWTHER:  What I mentioned in my brief is he's

24   currently employed at Sinclair, which is, his job is a -- he's a

25   software engineer, but his job is different at Sinclair than what

1   it is.  I understand the Court's point, clearly.  He did the

2   crime for this company; now he's going to be working at this

3   company.  My point was --

4           THE COURT:  You have got to help me.  What's Sinclair?

5           MR. LOWTHER:  It's a digital company.

6           THE COURT:  Okay.  It was an oil company the last time I

7   checked.

8           MR. LOWTHER:  Being from the East Coast, I didn't

9   recognize that.

10     So, again, I clearly understand the Court's point, but my

11  point again, possibly inarticulate in the motion, was he has

12  employment.  And it's going to be difficult for him to obtain

13  other employment outside of what he already has secured with a

14  felony indictment for fraud.  And that was the only implication

15  that I had by including that.

16     Now, of course, the condition is typically to maintain or

17  seek gainful employment, but I'm not suggesting that that be a

18  condition of his release.  Because what happens if he gets fired?

19  That still doesn't mean that he's going to be a risk of flight.

20  I'm simply suggesting that he has a means to pay his monthly

21  bills while he's pending trial.

22          THE COURT:  In this district, at least, probably the

23  most common condition of supervised release is that he have no

24  access to a computer.  That's extremely common.  So how does

25  that --

1       MR. LOWTHER:  And if that's the condition the Court --

2  well, first of all, I don't think --  If the Court finds that the

3  government has not met its burden of proof, I don't think, given

4  the circumstances, that would be the least-restrictive condition

5  simply because, according to the government's own theory, he was

6  able to commit the alleged fraud by using his position at

7  Microsoft, not simply because he had access to a computer.  So I

8  don't think that a prohibition, you know, to a computer ...

9  You know, typically, it's in different type cases.  2250s, right?

10  You know, there's no Internet access at all.  I just don't know

11  that that be would a least-restrictive condition here.

12       THE COURT:  You've got to understand, I have a terrible

13  sense of humor, but that seems to me a little bit like telling

14  Willie Sutton he can't rob banks; he can only rob candy stores.

15       MR. LOWTHER:  Only that there was no relation between

16  the two.

17       THE COURT:  Go ahead, sir.

18       MR. LOWTHER:  So given the argument, the situation, the

19  government's presentation, I just respectfully submit the

20  government has not proven that he's a risk of flight by a

21  preponderance of the evidence.  He's not -- they have not proven

22  that he poses a pecuniary danger by clear and convincing

23  evidence.  And, once again, I know that is a legal thing, for

24  sure.  It just wasn't proven in this case.

25       Pretrial Services initially recommended a personal

1    recognizance bond.  And speaking of a moving target, you know,

2    districts in -- number one, you never know what Pretrial Services

3    is going to do among districts.  Secondly, you never know that

4    this district likes a personal recognizance bond with a

5    financially responsible party, this district likes an unsecured

6    bond.  I don't really think that matters to us.

7        I would say that one thing that does seem to be common among

8    the districts is Pretrial Services typically takes a conservative

9    approach.  I know Mr. Dion took some issue with Pretrial

10   Services' decision as he briefed, but, you know, I don't think

11   that that was hardly a technicality on which Pretrial Services

12   made a recommendation that it didn't believe was appropriate.

13       So I would ask the Court to adopt the recommendation in this

14   case, to set a personal recognizance bond with a financially

15   responsible party, or even set an unsecured bond in any amount

16   that the Court thinks would be appropriate.

17       Ms. Lynn has testified here.  You have absolutely -- I submit

18   you have no reason to believe that she's not sincere about the

19   assets that she has and her willingness to stand on this bond.

20   And you can pick a number.  She's fully aware of what happens if

21   he flees the jurisdiction.  And I just don't see that happening.

22   I'm not being laissez-faire about what the bond is; I'm just

23   simply saying that he's not a risk of flight, she is willing to

24   put her assets up to ensure that, and, really, whatever bond, and

25   then conditions of release for that bond that would satisfy this

1    Court to maintain that status quo, we certainly think -- we do

2    think would be appropriate.

3            THE COURT:  I'm going to give you a chance to salvage a

4    really bad question you asked.  You asked her about the house,

5    and she said we own a house.  To me, owning and having a mortgage

6    on a house, I have no idea what the value of that house is.

7            MR. LOWTHER:  When I discussed her assets, she and her

8    husband have joint assets, and then she has -- the other thing

9    she mentioned was approximately $200,000 in various instruments.

10   And that's what simply I was going to ask the Court to consider

11   with the security.

12           THE COURT:  All right.

13           MR. LOWTHER:  Let me be more clear about that.  She

14   doesn't have $200,000 sitting in a bank, but she does have

15   $200,000-plus in free and clear assets.  The only reason I say

16   that is the Court could say, sure, a million dollar bond with

17   $200,000 surety.  By the time she cashed these accounts out, you

18   know, we're going to have a trial date.  On the other hand --

19           THE COURT:  You have a trial date right now.

20           MR. LOWTHER:  Well, I know, but we would be on that

21   trial date by the time all of that happens.  That's October

22   the 21st.

23       So you can consider those assets when determining what that

24   surety should be.  I'm not suggesting a personal recognizance

25   bond with, you know, an admonition to please come to court.  I

1   understand there has to --  Given the circumstances, given the

2   gravity of the case, nobody is standing here from the defense

3   side thinking that this case is some kind of joke or not serious.

4   We understand that.  But we're simply doing our best to

5   underscore that, at this stage of the proceeding, given the

6   reason we're here, the government hasn't met its burden, and

7   we're simply looking at whether Mr. Kvashuk is a risk of flight

8   and whether he's a danger.  And I think you have more than enough

9   as far as -- and I don't want to use "surety" in the legal

10   term -- but security to make a meaningful release pending trial,

11   a meaningful bond.

12        THE COURT:  Eighty-seven to 108 months makes this an

13   important case.

14        MR. LOWTHER:  I agree.

15        THE COURT:  Yeah.

16     All right.  Anything else, sir?

17        MR. LOWTHER:  But every drug defendant who comes through

18   these courts is looking at more time than that.  Sexual

19   exploitation of a child.  Those defendants are on release

20   constantly, the Northern District of Georgia, Western District of

21   Washington.  Those guideline ranges are well above ten years.

22   It's very typical, 155 to 188, sometimes higher.  But that alone

23   doesn't demonstrate that these guys and gals, so to speak -- I

24   didn't mean to be so colloquial -- aren't going to come back to

25   court to answer the charges.  I, frankly, never had it happen.

1          THE COURT:  That would be a first.

2     Anything else?

3          MR. LOWTHER:  No, Your Honor.

4          THE COURT:  All right.  Mr. Dion, you get the last word,

5     and then I'm going to take a short break and go back and get two

6     more cough drops.

7          MR. DION:  Your Honor, the defense argued that unlike

8     someone with no education or no skills, Mr. Kvashuk is not a

9     danger because he has skills.  Part of what makes him

10    threatening in this case is those skills, is the ability that he

11    has, that most people do not have, to disguise their identities

12    online, to use sophisticated software to erase their

13    cryptocurrency trail, and to create an actual automated software

14    program that mechanizes the process of embezzlement.

15        The defense argues that Mr. Kvashuk wouldn't have hidden any

16    assets because he didn't know that he was going to be the target

17    of an investigation.  The evidence shows that his goal was to not

18    become the target of an investigation, that he took step after

19    step after step to prevent discovery and that he took step after

20    step after step to cover the money trail.

21         THE COURT:  Well, stop there for a moment.  Doesn't that

22    really ignore the fact that he buys a flashy car for $106,000,

23    that he pays 1.6 million in cash for a house?  That's kind of not

24    covering your trail.

25         MR. DION:  There's no question that he had assets in

1    plain view.  He absolutely did.  There's no doubt about that.

2            THE COURT:  I know that employment at Microsoft is

3    lucrative, but that seems rather extreme.

4            MR. DION:  Right.

5        And, in fact, if we take a look at his tax returns, as shown

6    in the complaint, paragraph 59, in 2017, he reports income of

7    about $114,000, but there are deposits into his account of

8    139,000.  In 2018, he reports income of a little over 83,000, but

9    there are deposits into his Wells Fargo account of $2.9 million.

10       So, yes, he had assets in plain view because, at some point,

11   if you are going to enjoy the fruits of your crime, if you are

12   going to live in a nice house and you are going to drive a car,

13   that's what all of this is about.  The $10 million note talked

14   about buying a house in Maui, buying a house near a ski lift,

15   spending money in different ways all over the world, because you

16   don't commit a crime, you don't embezzle $10 million, to live

17   like you are making a hundred thousand.

18       But at the same time, he took steps that put him in an

19   excellent position to conceal additional assets if he wanted to.

20   And now having done overseas transactions that are hard to get

21   records from, having erased the blockchain trail, which serves no

22   purpose other than to conceal the money trail, and having spent

23   apparently hundreds of thousands of dollars to do that, he now

24   says, well, where are the other assets?  This is like the pirate

25   who buries his treasure and then says, I guess there's no more

1    money because you can't find it.

2        Yes, we have been looking at his devices for a while now.

3    There's a tremendous amount of data on there.  There is a virtual

4    machine that the agents are still trying to penetrate and get up

5    and running.  There's going to be a lot of follow-up

6    investigation to try to follow the money trail that he so

7    carefully destroyed.

8        It is impossible to say for sure that there are more assets

9    out there because that is the nature of unknown assets.  Until

10   you find them, you don't know for sure that they are there.  But

11   there is red flag, after red flag, after red flag, showing that

12   this defendant was doing everything in his power to make sure

13   that we could not see where all of his money was going.

14            THE COURT:  All right.  Counsel, it is 3:20 right now.

15   I will be coming back out at 3:25.

16       We will be in recess.

17                        (Recessed.)

18            THE COURT:  Please be seated.

19       Counsel, I wanted to spare you all the coughing spree that I

20   was going to have, so I went in and refreshed my collection of

21   cough drops.

22       The matter that is before the Court is the motion for -- let

23   me get my notes out here -- motion for revocation of the

24   detention order.  As I think we have all at this point agreed,

25   the first question that I have to answer, under 3142(f), is, do I

1    consider the defendant a serious risk that that person will flee?

2        My conclusion to that is that by a standard of clear

3    preponderance of the evidence, the government has established

4    that.  That is based on the fact that the defendant is a Ukranian

5    citizen, he is without permanent status in this country, although

6    he is here on a documented basis.  His application for asylum can

7    be interpreted in a number of different ways, but I don't need to

8    reach those, other than to say something that I believe we all

9    know, which is that a conviction in this matter will have a very

10   detrimental effect, or potentially may have a very detrimental

11   effect on the application for asylum.

12       The government makes much out of the fact that Ukraine

13   doesn't allow extradition.  I would agree with the defendant that

14   that's only part of the question.  He may not want to go back to

15   the Ukraine.  He may be unable to go back to the Ukraine.  But as

16   the point has been made here in court today, that doesn't mean

17   there aren't other places that would put him beyond extradition.

18       The second consideration, and one that's very serious to me,

19   is that the defendant, at 25 years old, faces a long prison

20   sentence in this matter.  The guideline range, at least

21   preliminarily, is set at 87 to 108 months.

22       The government alleges the defendant stole or embezzled

23   $10 million from Microsoft.  The case that's before me is a case

24   of mail fraud, set to go to trial in October of this year.

25       Does the defendant have the means to flee?  Just so that our

 1    record is clear, it is my belief that the defendant has no

 2    obligation to disclose information about his financial situation.

 3    I raise that issue simply to point out that what I have to

 4    consider on that question is the material that has been supplied

 5    by the government.  I find that they have met their burden in

 6    regards to the cryptocurrency transactions, and it raises enough

 7    issues in my mind that it satisfies a clear preponderance of the

 8    evidence standard that he has the means to flee if he wishes to

 9    do so; therefore, I find that the defendant is a flight risk.

10        The question, then, I turn to next is the one of, is he a

11    clear danger?  And I have looked at that with a great deal of

12    care because it's a much higher standard to find a risk of flight

13    and danger to the community.  Those are two different prongs.

14    The risk of flight, I have found.

15        Danger to the community and risk of flight ask me to examine

16    several different points of analysis, the first of which is the

17    nature and circumstances of the alleged offense.  The defense

18    makes a good point that it is not yet fully fleshed out, but we

19    are early on in this case, and I believe at this point the

20    government has carried its burden.  That doesn't mean that as we

21    go forward that decision can't be reconsidered.  But at least at

22    this time and under the facts as they are presented to the Court,

23    I believe that the government has carried its burden.

24        The second consideration under 3142(g) is the weight of the

25    evidence.  As the Ninth Circuit has helpfully pointed out, it

 1    should be the thing I consider the least.  Right now, the burden

 2    is on the government.  They have presented some of their

 3    evidence, including some very troubling aspects of the financial

 4    transactions.  And the defendant, as is his right, doesn't need

 5    to, and has not, presented evidence, other than to deny, and also

 6    to rebut or attempt to rebut some of the government's evidence.

 7        The third consideration is the history and characteristics of

 8    the person.  I mean no disrespect to the witness who testified,

 9    but I did not find her particularly credible.  She has a close

10    family history.  And what was striking to me was the difference

11    in tone between being led through the questions by defense

12    counsel and the government's more hostile cross-examination.  I

13    thought that was significant in terms of the credibility of the

14    witness.

15        And then, finally, the nature and circumstances of the danger

16    to a person or community posed by release.  Defense counsel and I

17    have a disagreement of exactly what that means.  Putting the

18    defendant back out armed with a computer, given the findings that

19    I have made in regards to behavior in this matter, or alleged

20    behavior in this matter, I find that he is indeed a risk to the

21    community.  I don't think he will attempt to obstruct justice,

22    but I would certainly question if he will not, in some manner,

23    attempt to continue concealment of potential assets.

24        And I have thought about, is there some condition or

25    combination of conditions that would allow me to allow him to be

1    on supervised release.  I think we finally came to an agreement

2    from both counsel and me that simply putting a global positioning

3    leg unit on him does not prevent someone from absconding, and it

4    simply usually results in us knowing where to find the bracelet.

5         Therefore, for these reasons, which I have stated on the

6    record, I find the defendant poses a risk of non-appearance and a

7    risk of financial and economic danger to the community.

8         Lastly, there does not appear to be any condition or

9    combination of conditions that will reasonably assure the

10   defendant's appearance at future court hearings while addressing

11   the danger to other persons in the community.

12        On that basis, I am going to deny the motion.

13        Counsel, is there anything further at this time?  Mr. Dion?

14        MR. DION:  Not from the United States.  Thank you.

15        THE COURT:  Mr. Lowther, on behalf of the defendant?

16        MR. LOWTHER:  No, Your Honor.

17        THE COURT:  Counsel, you have an October trial date.

18   Towards the end of our discussion here today, I think I heard

19   some reasons that I should be pessimistic that I will be seeing

20   you on that date, given the government's explanation of all that

21   mountain of work that's out there that needs to be accomplished

22   between now and then.  Well, whenever it takes place, it will be

23   a joy to have you back in the courtroom.

24        Good luck, sir.  We will be in recess.

25                    (Adjourned.)

August 27, 2019 - 61

1                    C E R T I F I C A T E

2

3          I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4     United States District Court in the Western District of

5     Washington at Seattle, do certify that the foregoing is a correct

6     transcript, to the best of my ability, from the record of

7     proceedings in the above-entitled matter.

8

9

10                         /s/ Nickoline Drury

11                         Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25